**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **Criminal Action No. 2020-0002** |
| ) | |
| **MARIO FELIX,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Kia Danielle Sears, Esq.,**
St. Thomas, U.S.V.I.
    *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendant Mario Felix's ("Defendant") Motion to Suppress (Dkt. No. 9); the Government's Opposition thereto (Dkt. No. 14); the evidence and arguments presented at the suppression hearing; Defendant's Supplement (Dkt. No. 63); and the Government's Response thereto (Dkt. No. 64). For the following reasons, the Court will grant in part and deny in part Defendant's Motion to Suppress.

## I.      BACKGROUND

On January 21, 2020, the Government filed an Indictment against Defendant charging him with three counts. (Dkt. No. 1). Count I is Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); Count II is Felon in Possession of Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and Count III is Possession of Firearm in School Zone, in violation of 18 U.S.C. §§ 922(q)(2)(A) and 924(a)(1)(B).

On February 17, 2020, Defendant filed a motion seeking to suppress "[a]ll physical evidence and statements illegally taken or flowing from the illegal search and seizure of [Defendant] by law enforcement officers or other agents of the government." (Dkt. No. 9 at 1). During the subsequent suppression hearing, the Government presented the testimony of two witnesses: Officers Darrell Walcott ("Officer Walcott") and Michael Jules ("Officer Jules") of the Virgin Islands Police Department ("VIPD"). The following evidence emerged from the testimony of the two witnesses.[1]

Early on November 13, 2019, Officer Walcott was with his partner in a marked police vehicle that was parked by Oscar Refrigeration and Furniture Center, facing Northside Road, in the La Grande Princess area. (H'rg Tr. at 5-8). They were in that area as part of the Virgin Islands Crime Initiative because, in months prior, the 911 emergency call center had been receiving numerous calls regarding gunshots in the area close to where they were parked. *Id*. at 6.

At approximately 3:00 a.m., Officer Walcott received reports of shots being fired as a crowd dispersed from the Starlight Nightclub. *Id*. at 7. Officer Walcott also heard multiple gunshots being discharged, and could hear the gunshots getting louder and louder. *Id*. at 8. He could also hear a vehicle accelerating and see a car traveling at a high rate of speed in the direction where he and his partner were located. *Id*. According to Officer Walcott, the car was going approximately 50-60 miles per hour in a 20-35 miles per hour zone. *Id*. at 90. Officer Walcott did not see any other car driving on the road. *Id*.

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

Over the radio, Officer Walcott inquired whether the other VIPD units in the area had heard the shots being discharged, and they answered in the affirmative. *Id.* at 8. Officer Walcott observed that the car driving towards him was a dark grey or silver Ford Focus with its windows down. *Id.* at 9. As the vehicle passed him, Officer Walcott could make out a silhouette of a male who appeared to have light skin. *Id.* Officer Walcott activated his emergency lights and siren and followed the vehicle, but the vehicle did not stop. *Id.* at 10.

Around this time, Officer Jules, who was also part of the Virgin Islands Crime Initiative, was parked at Five Corners. *Id.* at 94. He heard gunshots being fired, and heard them getting further and further away from where he was parked. *Id.* at 95. Then, Officer Jules received confirmation via radio that gunshots were being fired around Starlight Nightclub and learned that Officer Walcott had the suspected vehicle in sight. *Id.* at 96. Officer Jules began driving west on Northside Road to assist Officer Walcott. *Id.*

Once Officer Walcott caught up with the vehicle in the vicinity of Avis Rent a Car, the car made a right turn onto Princess Road towards Judith's Fancy. *Id.* at 10. Officer Walcott noticed that the car was going so fast that smoke came out from under its tire when it made the turn. *Id.* Officer Walcott was about three car lengths behind the suspected vehicle when it arrived at an intersection and ran over a stop sign, through a fence, and onto someone's personal property. *Id.* at 11. At this point, Officer Walcott had been pursuing the vehicle for approximately four minutes. *Id.* at 65.

Officer Walcott observed a male wearing a black baseball cap and holding a firearm exit the vehicle while it was still in motion. *Id.* at 12-13. Specifically, Officer Walcott could see the slide and the lower receiver of the firearm. *Id.* at 70. The individual ran around the vehicle towards the house on the property, and the car continued to move and eventually crashed into a tree. *Id.* at

3

13. As the individual was making his way around the rear of the vehicle, Officer Walcott yelled: "Police, stop; drop the gun." *Id*. at 20, 69. However, the individual continued to run towards the back of the house on the property with the firearm in his hand. *Id*. at 20. Officer Walcott informed a person who had exited the house on the property that officers had everything under control, and then continued to pursue the individual by foot. *Id*. at 21. Officer Walcott eventually had to retreat and lost sight of the individual because of the presence of bees and a fence. *Id*. at 21, 74.

When Officer Jules and other supporting units arrived at the scene—via at least two more police vehicles—Officer Walcott instructed the officers where to go and they created a perimeter. *Id*. at 20, 74. Soon after, Officer Jules observed an individual sticking his head out from behind a vehicle on the adjacent property. *Id*. at 22, 97-98. Upon Officer Jules alerting the other officers of such and shouting: "Police, don't move," the individual took off running. *Id*. at 22, 99. The individual ended up at an old, wooden structure, where the officers yelled: "Let me see your hands. Let me see your hands. Down on the ground. Down on the ground." *Id*. at 24. Some officers— including Officer Walcott—had their guns drawn at this time. *Id*. at 83-84. There were 7-8 officers in the area. *Id*. at 83.

The individual got down on the ground with his hands up, and Officer Walcott asked: "Where's the firearm? Where's the firearm?" *Id*. at 24. As Officer Walcott asked this question, a different officer handcuffed the individual. *Id*. at 88. Officer Walcott testified that he asked this question because he was concerned for the safety of the officers and the safety of anyone else who might have been in the area. *Id*. at 25. The individual replied: "What firearm? I don't know what firearm you're talking about. I ran from you all because I'm on federal probation, and I have drugs on me." *Id*. at 24. At the hearing, Officer Walcott identified Defendant as the individual with whom he had this exchange, and as the same individual whom he had seen getting out of the vehicle. *Id*.

Officer Jules transported Defendant to the Wilbur H. Francis Command Center in Frederiksted. *Id*. at 104. At the station, Defendant was taken into an interview room, where officers advised him of his *Miranda* rights. *Id*. Defendant verbally represented that he understood his rights, and declined to sign the waiver of rights form. *Id*. at 105. Defendant refused to give a statement regarding the circumstances that brought him to the station, informing the officers that he did not wish to make a statement. *Id*. at 122. Then, Officer Jules asked Defendant whether he has, or ever had, a license to carry a firearm in the Virgin Islands, to which Defendant answered in the negative. *Id*. at 106. Officer Jules explained that, because Defendant refused to give a statement, he did not ask Defendant any more questions. *Id*. at 122. There was at least one other officer in the interview room. *Id*. at 107. At this time, Defendant was still handcuffed; the officers did not have their guns pointed at Defendant nor did they raise their voices at him; and Defendant seemed calm. *Id*. at 107-08.

After Defendant was apprehended, officers searched the perimeter. *Id*. at 101. A firearm was found in an area next to the wooden structure, over a fence, and in a bush. *Id*. at 27-28. Beside the firearm was a magazine and a black baseball cap. *Id*. at 30. Officer Walcott testified that the black baseball cap was the same one he had seen the individual who exited the car wearing. *Id*. When Officer Walcott searched the vicinity of the car that had crashed into the tree, he discovered a black firearm magazine with live rounds inside. *Id*. at 25. Inside the car, officers found one live round in the front passenger seat and another live round on the floor next to the brake. *Id*. at 31-32. Officer Walcott also searched Northside Road—where he had heard the shots being fired—and found approximately eighteen 5.7 spent shell casings. *Id*. at 34, 36.

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   Seizure

The Fourth Amendment to the United States Constitution protects individuals from, *inter alia*, unreasonable seizures. U.S. Const. amend IV. A person is seized for Fourth Amendment purposes when either (1) "an officer applies physical force" to restrain the person's movement; or (2) the person "submits to an officer's show of authority." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *California v. Hodari D.*, 499 U.S. 621, 625 (1991)); *see also United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) ("A seizure occurs when there is either (a) a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful, or (b) submission to a show of authority.") (internal quotation marks and citation omitted).

"Generally, a seizure is reasonable only where it is justified by a warrant or probable cause." *Couden v. Duffy*, 446 F.3d 483, 494 (3d Cir. 2006) (citation omitted). Probable cause to arrest requires more than mere suspicion of criminal activity. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995). It does not, however, "require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Id*. at 483 (citing *United States v. Glasser*, 750 F.2d 1197, 1205 (3d Cir. 1984)). "Rather, probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Id*. (citations omitted). In other words, "probable cause exists if there is a fair probability that the person committed the crime at issue." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016) (citations, internal quotation marks, and alterations omitted).

6

### B.      Search

#### 1.      Abandonment

The Fourth Amendment also protects individuals from unreasonable searches. U.S. Const. amend. IV. "The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). However, a warrantless search of property is permissible under the Fourth Amendment where the owner has abandoned his reasonable expectation of privacy in that property. *United States v. Fulani,* 368 F.3d 351, 354 (3d Cir. 2004) (citing *Abel v. United States*, 362 U.S. 217 (1960)). This determination must be made from an objective viewpoint, and proof of intent to abandon must be established by clear and unequivocal evidence. *Id*. Courts must look at the totality of the facts and circumstances in determining whether an individual did, in fact, abandon his reasonable expectation of privacy in the property at issue. *Id*.; *see also McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011). In most cases, disclaiming ownership or physically relinquishing the property is sufficient to establish abandonment. *United States v. Liu*, 180 F.3d 957, 960 (8th Cir. 1999).[2]

#### 2.      Automobile Exception

One exception to the Fourth Amendment's warrant requirement is the automobile exception. "The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)); *see also United States v. Donahue*, 764 F.3d 293, 295 (3d Cir.

---

[2] "[A]bandonment for purposes of the Fourth Amendment differs from abandonment in property law; here the analysis examines the individual's reasonable expectation of privacy, not his property interest in the item." *Fulani*, 368 F.3d at 354 (citing *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990)); *see also United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005).

2014) ("The Supreme Court has interpreted—and reinterpreted—the automobile exception so expansively that the Court essentially has obviated the requirement that the government obtain a warrant to search a vehicle provided it has probable cause to believe that the vehicle contains evidence of a crime."). Further, "[w]hile a seizure or search of property without a warrant ordinarily requires a showing of both probable cause and exigent circumstances, the 'ready mobility' of automobiles permits their search based only on probable cause." *Burton*, 288 F.3d at 100. Because there is no exigency requirement, "probable cause does not dissipate after the automobile is immobilized." *Donahue*, 764 F.3d. at 300. Accordingly, a vehicle can be searched without a warrant once probable cause exists "even though [the government] has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search." *Id*.

"The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances . . . .'" *Id*. at 301 (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)) (quotations omitted). In determining whether probable cause exists, courts are to evaluate "the events which occurred leading up to the search, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id*. (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)) (quotations, brackets, and ellipses omitted). "If there was a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause for the search." *Id*. (quoting *Gates*, 462 U.S. at 238).

### C. *Miranda*

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST., amend. V. In

*Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479). "When the police fail to give adequate *Miranda* warnings . . . any statement made by the individual who is subject to custodial interrogation is inadmissible at trial." *United States v. Brooks*, 358 F. Supp. 3d 440, 476 (W.D. Pa. 2018) (citing *New York v. Quarles*, 467 U.S. 649, 654 (1984)).

*Miranda*'s holding is based on a recognition "that interrogation in certain custodial circumstances is inherently coercive," and suspects must therefore be "specifically informed of [their] *Miranda* rights and freely decide[] to forgo those rights" to ensure that the right against compulsory self-incrimination is preserved. *Quarles*, 467 U.S. at 654. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion).

A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotations omitted)). Further, an "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an agent should reasonably have foreseen would

9

elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

### 1.    Public Safety Exception

While statements made by a defendant stemming from custodial interrogation are generally inadmissible at trial and presumed to have been compelled if the defendant was not previously advised of his *Miranda* rights, the Supreme Court in *Quarles* established a public safety exception to *Miranda. Quarles*, 467 U.S. at 655. Under this narrow exception, police officers need not give the *Miranda* warnings before asking a suspect questions that are necessary to protect the public or the police from immediate danger. *Id.* 656-59, n.8. The public safety exception applies when it would have been objectively reasonable for the officer to believe that asking the question was necessary to protect the public or police from immediate danger. *Id.* at 656, 659 n.8. The public safety exception requires examination of the "totality of the circumstances." *United States v. Duncan*, 308 F. App'x 601, 605 (3d Cir. 2009) (citing *United States v. Reyes*, 353 F.3d 148, 152 (2d Cir. 2003) (citing *United States v. Banks*, 540 U.S. 31, 42 (2003) and *United States v. DeSantis*, 870 F.2d 536, 541 (9th Cir. 1989)).

### III.    DISCUSSION

#### A.    Seizure

Defendant argues that he was illegally seized because the officers had "no reason to believe that [he] had committed or was in the process of committing a crime." (Dkt. No. 9 at 4). In response, the Government argues that the officers had the requisite probable cause to arrest Defendant.[3]

---

[3] The Court notes that in its Opposition, the Government argues that Defendant was subjected to a *Terry* stop—rather than an arrest. (Dkt. No. 14 at 3-5). However, at the evidentiary hearing, the Government conceded that Defendant was placed under arrest when officers pointed their guns at

The Court finds that Officer Walcott had probable cause to arrest Defendant because the circumstances within Officer Walcott's knowledge were sufficient to warrant a reasonable conclusion that Defendant had committed an offense. *Orsatti*, 71 F.3d at 482. Officer Walcott heard shots fired in the vicinity of Starlight Nightclub, and heard the shots getting louder and louder. He saw only one vehicle—a dark-colored Ford—driving towards him. As the vehicle passed him, Officer Walcott observed the silhouette of a light-skinned male. Then, Officer Walcott turned on his emergency lights and siren and followed the vehicle. The vehicle continued driving at a high rate of speed—going nearly double the speed limit—and Officer Walcott could see smoke coming out from under the tires of the vehicle as it turned. The vehicle did not stop until it drove through a stop sign, went through a fence, and eventually crashed into a tree on someone's property.

Officer Walcott observed the driver exit the vehicle as it was still moving with a firearm in his hand and then run into the backyard of someone's house. The driver did not stop, even after the police identified themselves and instructed him to stop running. Shortly after Officer Walcott lost sight of the individual, Officer Jules saw an individual peeking out from behind a vehicle. Officer Jules yelled: "Police, don't move." However, the individual fled until he reached an old, wooden structure where the officers ordered him to the ground, handcuffed him, and arrested him. Officer Walcott identified Defendant as the individual involved, and as the same individual who had gotten out of the car with the gun in his hand while the car was still moving.

---

him and handcuffed him after ordering him to the ground at the wooden structure. The Court agrees, and finds that Defendant was both in custody and under arrest for purposes of *Miranda* at the time that he was seized at the wooden structure. *See, e.g.*, *United States v. St. Rose*, 189 F. Supp. 3d 528, 539 (D.V.I. 2016) (finding that the defendant was in custody when the officers drew their weapons, ordered the defendant to the ground, and handcuffed him).

Based on the totality of the circumstances, the Court finds that Officer Walcott had probable cause to arrest Defendant in that the facts leading up to the arrest, as described above, were sufficient to cause a reasonable person to believe that a crime was committed and that Defendant had committed the crime. *United States v. Reid*, 185 F. App'x 208, 209 (3d Cir. 2006) (holding that officers had probable cause to arrest a defendant after they activated their lights and sirens and pursued him as he fled in his car at a high rate of speed; the defendant knocked over a stop sign and eventually crashed into the concrete steps of a residence; an officer saw the defendant throw something that looked like a weapon out of the passenger side window; and the defendant fled from his vehicle before he was apprehended). Accordingly, the Court rejects Defendant's argument to the contrary.

**B.      Search**

Defendant argues that the police did not have probable cause to search the vehicle, and that the firearm was seized as the result of "forced abandonment" and must be suppressed. (Dkt. Nos. 9 at 5; 63). In response, the Government argues that Defendant abandoned the firearm and vehicle for Fourth Amendment purposes and, even if he did not abandon the vehicle, probable cause existed to search it under the automobile exception. (Dkt. No. 14 at 5-9). The Court finds that the search of the vehicle was appropriate both under an abandonment theory and pursuant to the automobile exception, and that Defendant abandoned the firearm for Fourth Amendment purposes.

**1.      Abandonment**

The Court finds that Defendant abandoned both the vehicle and the firearm for Fourth Amendment purposes. *Abel v. United States*, 362 U. S. 217, 241 (1960) (explaining that an individual has no reasonable expectation of privacy in abandoned property). Abandonment depends largely on the possessor's intent, *United States v. Minker*, 312 F.2d 632, 634 (3d Cir.

1962), "and the party relying on it must establish the necessary state of mind by clear and unequivocal evidence." *United States v. Moody*, 485 F.2d 531, 534 (3d Cir. 1973) (citing *Friedman v. United States*, 347 F.2d 697, 704 (8th Cir. 1965) and *United States v. Robinson*, 430 F.2d 1141, 1143 (6th Cir. 1970)).

### i.      Vehicle

Here, the totality of the facts and circumstances show that Defendant clearly and unequivocally abandoned the car and all of its contents. *Fulani*, 368 F.3d at 354. After being pursued by the police in a marked police vehicle with its emergency lights and siren activated, and crashing through a stop sign and a fence, Defendant got out of the car—while it was still in motion—and ran away from it.[4] While the officers were chasing Defendant as he ran away, they ordered him to stop, and he did not comply. *Moody*, 485 F.2d at 534. Because the police had their emergency lights and siren on, and were driving in a marked police vehicle, Defendant undoubtedly knew that he was being pursued by the police. The clear and unequivocal evidence reasonably leads to only one conclusion—that Defendant "knew he was being followed by law enforcement officers and was seeking both to avoid arrest and abandon the incriminating evidence in . . . his car." *Moody*, 485 F.2d at 534. Accordingly, the Court finds that Defendant abandoned the vehicle in question and thus lacks Fourth Amendment standing to challenge the search thereof. *See United States v. Mooty*, 96 F. Supp. 3d 472, 488 (E.D. Pa. 2015) (holding that the defendant

---

[4] Defendant originally stated in his Motion that he was merely "accused of driving" the vehicle in question. (Dkt. No. 9 at 5). However, "[t]o have Fourth Amendment standing, the proponent of a motion to suppress must prove he had both an objectively reasonable expectation of privacy and an actual, subjective expectation of privacy." *United States v. Correa*, 653 F.3d 187, 191 n.3 (3d Cir. 2011) (emphasis in original); *see also United States v. Rice*, 825 F. App'x 74, 76 (3d Cir. 2020) ("A person challenging a search through a motion to suppress 'bears the burden of proving . . . that he had a legitimate expectation of privacy [in the place searched].'") (quoting *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (citation and quotation omitted)). At the suppression hearing, Defendant acknowledged that he was indeed the individual who was driving the car.

abandoned his vehicle for Fourth Amendment purposes when, despite the commands of law enforcement agents, he fled the scene and left his vehicle running in the middle of the street with the key in the ignition).

### ii.   Firearm

The totality of the facts and circumstances also show that Defendant abandoned the firearm. *Fulani*, 368 F.3d at 354.

Officer Walcott testified that as Defendant exited from the moving vehicle, he was wearing a black baseball cap and holding a firearm. Officer Walcott further testified that he was able to see the slide and the lower receiver of the firearm. According to Officer Walcott, as Defendant made his way around the rear of the vehicle, he continued running towards the back of the house with the firearm in his hand. A firearm and a black baseball cap were later discovered in the area next to the wooden structure where Defendant was apprehended—over a fence and in a bush. Because the firearm was not on Defendant's person when the officers arrested him, Defendant had to have discarded the weapon before he was seized and therefore when he was still being pursued by law enforcement. It is well established that a firearm is abandoned when a defendant discards it while fleeing from police. *See, e.g., United States v. Acosta*, 751 F. App'x 201, 203 (3d Cir. 2018); *United States v. Richardson*, 504 F. App'x 176, 182 (3d Cir. 2012); *United States v. Davis*, 328 F. App'x 138, 142 (3d Cir. 2009); *Gov't of Virgin Islands v. Olinsky*, 119 F. App'x 405, 407 (3d Cir. 2005).

In his Supplement, Defendant argues that the firearm was seized as a result of "forced abandonment" and should be suppressed. (Dkt. No. 63). In order to prevail on a "forced abandonment" theory, the firearm had to be abandoned as a direct result of an unlawful seizure. *United States v. Rivera*, 441 F. App'x 87, 89 (3d Cir. 2011); *United States v. Coggins*, 986 F.2d 651, 653 (3d Cir. 1993). However, as the Court has already found, Defendant was subjected to a

lawful seizure/arrest. In view of this finding, the abandonment of the firearm could not have been the result—direct or otherwise—of an unlawful seizure. *United States v. Ware*, 2013 WL 6283955, at *8 (E.D. Pa. Dec. 2, 2013), *aff'd*, 595 F. App'x 118 (3d Cir. 2014) (concluding that even if the defendant had been seized at the time he dropped contraband to the ground, his "forced abandonment" argument would be meritless because the seizure was lawful). Thus, Defendant's argument that the firearm was seized as a result of "forced abandonment" is unavailing.

Further, as discussed above, the testimony presented at the evidentiary hearing supports a finding that Defendant abandoned the firearm before the seizure took place. In *Hodari D.*, the Supreme Court held that the defendant, who dropped a bag of cocaine while fleeing the police, had not been "seized" under the Fourth Amendment because he had not complied with the officers' show of authority before being physically apprehended. 499 U.S. at 626-27. Similarly here, both Officers Walcott and Jules testified that Defendant continued to run notwithstanding each of their respective commands to stop. Thus, Defendant did not submit to authority in any way until he ultimately was apprehended next to the wooden structure where police officers ordered him to get on the ground and handcuffed him. By the time of his submission to authority and apprehension, the firearm had been discarded. Thus, Defendant was not seized until after he voluntarily discarded the firearm during the chase. For this additional reason, the seizure of the firearm was not a result of "forced abandonment." *See Rivera*, 441 F. App'x at 90 (finding that the bag of cocaine that the defendant dropped during a police chase did not constitute forced abandonment because the defendant had not yet been seized).

Accordingly, the Court finds that Defendant abandoned the firearm, and thus lacks Fourth Amendment standing to challenge the seizure of the weapon.

### 2.      Automobile Exception

Even if it could be found that Defendant had not abandoned his vehicle, the search of the vehicle would still be valid under the automobile exception to the warrant requirement.

The testimony revealed that, after hearing gunshots, Officer Walcott observed a dark-colored vehicle traveling away from the scene at a high rate of speed heading west. Despite being pursued by a police vehicle with its emergency lights and siren on, the driver of the vehicle did not stop and eventually lost control, ran over a stop sign, and crashed through a fence. An individual then got out of the car—while it was still running—with a firearm in his hand, and ran away. The Court finds that under these circumstances there would be probable cause to search the vehicle because "an objectively reasonable officer would be justified in concluding that the vehicle contained evidence of a . . . firearm-based crime[.]" *United States v. Perry*, 79 F. Supp. 3d 524, 535 (D.N.J. 2015); *see also Donahue*, 764 F.3d at 301. In this regard, *United States v. Bentley*, 528 F. App'x 247, 251 (3d Cir. 2013), is instructive, wherein a panel of the Third Circuit found that the automobile exception applied when the search of a vehicle occurred almost immediately after criminal activity took place; officers suspected that the vehicle contained illegal contraband related to the crime; and the defendant had left the car on the side of the road.

Accordingly, the Court finds that the search of the vehicle was also proper under the automobile exception to the warrant requirement.

### C.      Questioning of Defendant

Defendant argues that he was interrogated in violation of *Miranda* both at the scene and while at the police station. (Dkt. No. 9 at 5-7). In response, the Government asserts that the questioning of Defendant at the scene was proper under the public safety exception to *Miranda* and that Defendant voluntarily, knowingly, and intelligently waived his rights at the station. (Dkt.

No. 14 at 12). While the Court finds that the public safety exception applies to the question Officer Walcott asked Defendant at the scene, the Court also finds that Defendant was questioned in violation of *Miranda* at the station.

### 1.    At the Scene

The dispositive question here is whether, considering all of the circumstances, it was objectively reasonable for Officer Walcott to have thought that asking Defendant about the location of the gun was necessary to protect himself, other officers, and/or the public from immediate danger. *Duncan*, 308 F. App'x at 605.

Officer Walcott testified that after hearing gunshots and chasing a speeding car that ran over a stop sign and through a fence on someone's property, he saw the driver—who he identified as being Defendant—get out of the car, while it was still moving, with a gun in his hand. Based on those observations, it was reasonable for Officer Walcott to believe that Defendant was in possession of a gun, and that he had been shooting that gun recently. Thus, it was objectively reasonable for Officer Walcott to be concerned for the safety of himself and his fellow officers as well as any member of the public who was in the area, including the individual who exited the house that was on the property of the car crash. In short, Officer Walcott's question regarding the location of the gun was driven by an "objectively reasonable need to secure [officer and] public safety—namely, to locate the missing firearm and prevent further violence." *United States v. Judge*, 447 F. App'x 409, 415 (3d Cir. 2011).

Accordingly, considering all of the circumstances, the Court finds that the public safety exception applies, and no *Miranda* warnings were required in order for Officer Walcott to ask Defendant about the location of the firearm. *See United States v. Johnson*, 95 F. App'x 448, 452 (3d Cir. 2004) (finding that the question "do you have a gun?" was "clearly intended to secure the

17

officers' safety and the safety of the public"); *see also United States v. Watters*, 572 F.3d 479, 482-83 (8th Cir. 2009) (holding that "the officers' questions were designed to locate a weapon [the defendant] might have hidden shortly before his arrest" and were "prompted by a concern for public safety").

### 2.     At the Station

At the evidentiary hearing, Defendant argued that he was asked a question at the police station after he had invoked his right to remain silent, and thus in violation of *Miranda*. The Court agrees.

An individual must "unambiguously" invoke his right to remain silent. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). Here, Officer Jules testified that, after Defendant was given his *Miranda* warnings and verbally represented that he understood them, Defendant declined to sign the waiver of rights form and informed Officer Jules that he did not wish to make a statement. A defendant telling police officers that he does not want to make a statement constitutes an invocation of the defendant's right to remain silent. *See Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (endorsing the practice of police officers ceasing interrogation immediately after a defendant states that he does not want to discuss the crime); *United States v. Tyler*, 164 F.3d 150, 153 (3d Cir. 1998) (acknowledging that the defendant invoked his right to remain silent when he informed police that he did not wish to make a statement). In fact, Officer Jules testified that he did not ask Defendant any questions—other than the question regarding the license to carry—because Defendant had told him that he did not wish to make a statement. Further, while a defendant's refusal to sign a *Miranda* waiver form "does not preclude a finding of waiver," *United States v. Davis*, 2020 WL 3800534, at *12 (D.V.I. July 6, 2020) (internal quotation marks and citation omitted), the fact that Defendant refused to sign the *Miranda* waiver form *in addition* to

18

verbally expressing that he did not wish to make a statement supports the Court's conclusion that Defendant unambiguously invoked his right to remain silent.

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. Thus, because the Court has found that Defendant invoked his right to remain silent, "the inquiry is whether [Officer Jules] 'scrupulously honored' [Defendant's] assertion of his right to remain silent." *Tyler*, 164 F.3d at 154. Here, the Court finds that he did not, because after Defendant invoked his right to remain silent, Officer Jules asked Defendant whether he has, or ever had, a license to carry a firearm in the Virgin Islands. This constitutes custodial interrogation because it has already been established that Defendant had been arrested and was in custody at this point, and Officer Jules should have known that the question was reasonably likely to elicit an incriminating response. *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012); *United States v. Woodley*, 2021 WL 1082225, at *7 (D.V.I. Mar. 20, 2021); *St. Rose*, 189 F. Supp. 3d at 539.

Accordingly, the Court finds that Officer Jules' question at the station was in violation of *Miranda*, and Defendant's answer to it must be suppressed.

### D.    Fruit of the Poisonous Tree

Defendant argues that the evidence seized in this matter should be suppressed as "fruit of the poisonous tree"—as a result of both an illegal seizure and illegal search. (Dkt. Nos. 9 at 8-9, 63). Evidence obtained as a result of an unreasonable search and seizure is inadmissible at trial and must be suppressed as "fruit of the poisonous tree." *See Wong Sun*, 371 U.S. at 487-88. However, because the Court has already found that no illegal search or seizure occurred under the circumstances presented here, no evidence is subject to suppression as "fruit of the poisonous tree." *Cf. United States v. Mosley*, 454 F. 3d 249, 269 (3d Cir. 2006) (finding that because defendant was

illegally seized, the guns found which directly resulted from his seizure were fruit of the poisonous tree and must be suppressed).

### IV.   CONCLUSION

For the reasons discussed above, the Court will grant in part and deny in part Defendant's Motion to Suppress. Specifically, the Court will grant Defendant's Motion to Suppress only to the extent that it will suppress his answer to the question regarding whether he has, or ever had, a license to carry a firearm in the Virgin Islands. The Court will otherwise deny Defendant's Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date:   July 29, 2021

_____/s/_____
WILMA A. LEWIS
District Judge